Slip Op. 15 - 132

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
| --- | --- |
| XEROX CORP. | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : Before: R. Kenton Musgrave, Senior Judge |
|  | : Court No. 05-00474 |
| UNITED STATES, | : |
|  | : |
| Defendant. | : |
|  | : |

## OPINION

[On customs duty classification of certain static converters, judgment for the plaintiff.]

Decided:  November 23, 2015

*John M. Petterson*, *Elyssa R. Emsellem*, *Maria E. Celis*, *Richard F. O'Neill*, and *Russell Andrew Semmel*, Neville Peterson, LLP, of New York, NY, for the plaintiff.

*Marcella Powell*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant.  On the brief were *Benjamin C. Mizer*, Acting Assistant Attorney General, and *Amy M. Rubin*, Assistant Director.  Of counsel on the brief was *Chi S. Choy*, Attorney, Office of the Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection, of Washington DC.

Musgrave, Senior Judge: Cross-motions for summary judgment before the court

concerning an entry of two "pre-clean dicorotron high voltage power supply" units imported through

the Port of New York in year 2004 dispute the customs duty classification thereof under the

Harmonized Tariff Schedule of the United States ("HTSUS").[1]  The parties agree that the power

---

[1]   Unless otherwise indicated, all references herein to headings, subheadings, chapters, sections, and notes are to those of the year 2004 version of the HTSUS.

supplies are static converters covered by heading 8504 ("[e]lectrical transformers, static converters (for example, rectifiers) and inductors; parts thereof") and suitable for physical incorporation into the plaintiff's "iGen3 Digital Production Press." The subheading appropriate for their classification depends upon the classification of the iGen3. Thus, the dispute is over whether the units are entitled to duty-free entry under subheading 8504.40.60 as "power supplies for automatic data processing machines or units thereof of heading 8471", or whether they are subject to 1.5% *ad valorem* customs duties under subheading 8504.40.95 as "other" static converters (*i.e.*, for machines not of heading 8471). U.S. Customs and Border Protection ("Customs") having classified the power supplies under the latterk, and having denied the plaintiff's protest thereof, the plaintiff having timely filed and its summons and complaint, predicated upon payment of all liquidated duties, charges and fees,[2] jurisdiction is here properly invoked upon 28 U.S.C. §§ 1581(a) and 2631(a). For the following reasons, the plaintiff persuades that judgment in its favor is appropriate.

I.  *Standard of Review*

The court reviews Customs' protest decisions *de novo*. 28 U.S.C. § 2640(a)(1). Classification for customs duty purposes is a two-step process of determining the meaning of relevant tariff provisions (a question of law) and determining whether the "nature" of the merchandise (a question of fact) falls within the tariff provision as properly construed. *E.g.*, *Orlando Food Corp. v. United States*, 140 F.3d 1437 (Fed. Cir. 1998).

Proper classification under the HTSUS is directed by the General Rules of Interpretation ("GRIs") and, if relevant, the Additional U.S. Rules of Interpretation ("ARIs"). *E.g.*,

---

[2]  *See* Compl. ¶3; Ans. ¶3.

*Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998).  The GRIs are not

optional but statutory,[3] and they are applied in numerical order.  *See Honda of America Mfg. v.*

*United States*, 607 F.3d 771, 773 (Fed. Cir. 2010).  GRI 1 provides that a tariff classification, "shall

be determined according to the terms of the headings and any relative section or chapter notes."[4] GRI

6 also provides in relevant part that "the classification of goods in the subheadings of a heading shall

be determined according to the terms of those subheadings and any related subheading notes and,

*mutatis mutandis*, to the above rules, on the understanding that only subheadings at the same level

are comparable."

   "The terms of the HTSUS are construed according to their common commercial

meanings." *Millenium Lumber Distribution Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir.

2009).  Additional guidance, considered neither binding nor dispositive, may be found among the

Explanatory Notes ("ENs") of the Harmonized Commodity Description and Coding System

("HCDCS") maintained by the World Customs Organization, which are considered "generally

indicative of the proper interpretation of the [Harmonized Tariff System]".  *Lynteq, Inc. v. United*

*States*, 976 F.2d 693, 699 (Fed. Cir. 1992) (quoting H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess.

549 (1988)), *reprinted in* 1988 *U.S.C.C.A.N.* 1547, 1582.  *See also* T.D. 89-80, 54 Fed. Reg. 35127,

---

[3]  *See Libas, Ltd. v. United States*, 193 F.3d 1361, 1364 (Fed. Cir. 1999).

[4]  GRI 1, HTSUS; *see also Bauerhin Technologies Ltd. Partnership v. United States*, 110 F.3d 774, 777 (Fed. Cir. 1997) ("we begin our inquiry by examining the descriptions of the relevant headings, subheadings, and accompanying notes"); *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998); *Libas, Ltd. v. United States*, 193 F.3d 1361, 1364 (Fed. Cir. 1999) (noting that the chapter and section notes of the HTSUS are statutory law, not optional interpretive rules).

35128 (Aug. 23, 1989) (ENs "are generally indicative of the proper interpretation of these headings").

In its analysis, the court also accords a measure of deference to Customs classification rulings in proportion to their "power to persuade". *United States v. Mead Corp*., 533 U.S. 218, 235 (2001), citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).[5]  In the final analysis, however, the court also has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005), citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001).  *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

## II.  *Undisputed Facts*

Among the parties' papers, the following are averred as material facts not in dispute. The power supply unit controls the flow of electricity into the iGen3 from external power sources and also regulates the voltage within the interior of the iGen3.  *See* Joint Statement of Material Facts Not In Dispute ("JSMF")[6] ¶¶ 3 & 4.  In its condition as imported, the power supply is in the form

---

[5] "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore*, 323 U.S. at 140.

[6] All citations in the JSMF to support the parties' joint averments are omitted herein.  To the extent a certain level of technical detail may be deemed relevant, the parties agree on the following: that the power supply unit ("Part No. 105K26780") regulates the AC voltage of the dicorotron wire "over a range of 3920 to 6860 V rms, with voltage tolerances within +/- 3.5% of the set point over the output voltage range", JSMF, ¶¶ 1, 9; that the AC voltage corresponds to an input voltage range of 0.4 to 4.6 VDC and an expected AC output current in a rms range of 0 to 30 mA, *see id*. ¶ 10; that the power supply unit regulates the DC current of the dicorotron shield over a range of -50 to -200 µA, with current tolerances within +/- 5% of the set point; *id*. ¶ 11; that the DC current corresponds
(continued...)

of a board-level assembly, with a 12 pin input power connector, a 50 pin signal connector, a high

voltage output connector, and a high voltage return connector, all fastened to a steel mounting plate

that allows it to be mounted in the iGen3.  *See id*.  ¶¶ 5 &6.

       The iGen3 itself is a high-speed digital multifunction color laser printer designed and

used for both high-volume and "short run, on demand" printing of documents.  It is a customizable,

modular design capable of multiple front-end paper feeder units and back-end finishing units (*e.g.*,

collating, stapling) configured to the main "image output terminal" ("IOT") in which the

merchandise at bar is incorporated.  The basic configuration of the iGen3 includes a feeder, stacker,

and a "digital front end" ("DFE") print server, also called a controller.[7]  Feeders, stackers and DFEs

are imported separately from the iGen3 and are not at issue in this action.  *Id*. ¶ 30.

       Both the "90" and the "110" models measure six feet in width and eight feet in height

at the (highest) point of the IOT, but at 23 feet eight inches in length the110 model exceeds the 90

model by three feet.  *See id*. ¶¶ 19-20.  The iGen3 90 weighs 7,071 lbs and has a base price of

$405,000; the iGen3 110 weighs 7,892 lbs and has a base price up to $610,000.  The iGen3 prints

---

[6]  (...continued)
to an input voltage range of 1.5 to 4.6 VDC and an expected output voltage range of -3600 to -2000
VDC, *id*. ¶¶ 12-13; and that the power supply unit is also designed to discharge power rapidly when
the iGen3 is turned off and also via an output control that is designed to shut the power down and
turn off the iGen3 if threshold levels for a number of electrical control parameters are exceeded, *id*.
¶¶ 7-8 .

[7]  The parties agree that these DFEs are compatible with the iGen3: DocuSP Controller, Creo
Spire Color Server, and EFI Fiery Color Server.  JSMF ¶ 31.  The plaintiff explains that these servers
are basic computer systems constructed on either a Sun Fire or Intel and Microsoft PC platform; can
process digital images using a wide range of print languages, including but not limited to Adobe
Postscript, public document format (PDF), and tagged image file format (TIFF); and can
communicate with computer networks using Ethernet or TCP/IP network languages with network
protocols including IPX/SPX, TCP/IP, HTTP, IPP and AppleTalk.  Pl's Br. at 3.

at a rated speed of either 90 or 110 letter-sized (A4) color sheets per minute[8] (up to 6,600 per hour)

at a resolution of 600 by 4800 dots per inch using a line screen of up to 200 lines per inch with 256

gray levels. It can accommodate sheet sizes up to 14.33" by 20.5" and paper weights from 16-lb

bound up to 130-lb cover, coated or uncoated media, with a standard holding capacity of 30,000

sheets. Pl's Br. on Mot. for J. ("Pl's Br.") at 2-3; JSMF ¶¶ 22-27. The iGen3 can print on specialty

stocks and labels in sheets as large as 14.33" x 22.5" (364 x 572 mm), and measures the color

between every impression for consistency from sheet to sheet. JSMF ¶ 28.

        The iGen3 does not feature a scanner, is not used for digital copying, and does not

have a facsimile function. Pl's Br. at 3.

        Image printing on an iGen3 first requires receipt of a digital file at the particular DFE

(controller) that has been made part of the iGen3 configuration. *Cf.* JSMF ¶ 32 ("[o]nce a digital file

has been created on an originating computer or work station, the file is then transmitted to the

DFE"). Once received, the DFE then "rasterizes" the digital file, converting it into a bitmap (pixels

or dots), and once the rasterization process is complete, the file is then transmitted to the iGen3 for

production. *Id*. ¶¶ 33-34. The DFE also performs additional color management functions in the

process. Pl's Br. at 3.

        To produce images, the iGen3 operates by the "xerography" process. JSMF ¶ 35.

The digital file, now in the form of a bitmap, instructs the laser in the iGen3 to turn on and turn off,

discharging specific points on a photoreceptor belt in the shape of a dot or pixel, which discharge

will eventually attract toner to the dot. *See id*. The power supplies in the iGen3 charge the toner to

---

        [8] Hence, the model number designations of iGen3 90 and iGen3 110.

an opposite potential to the discharged dot area on the photoreceptor, which causes the toner to

basically jump from one area onto the photoreceptor belt. *Id*. ¶ 36. The toner particle is transferred

from the photoreceptor to the printer by putting a charge behind the paper, opposite to the charge of

the toner on the photoreceptor, which causes the toner to be pulled away from the belt and become

stuck to the paper. *Id*. ¶ 37. The paper is then run through a fusing operation, in which heat and

pressure melts the toner to the paper and prevents it from falling off. *Id*. ¶ 38.

      The defendant emphasizes the plaintiff's marketing and selling of the iGen3 as a

"digital production press."[9] Customers who have purchased the iGen3 include "graphic

communication companies, printers, and print-for-pay" companies. *Id*. ¶ 41. "The 'non-commercial'

*printers that* have purchased the iGen3 included '[c]'ompanies like Target, Walmart, United

Airlines, universities, [and] 'vertical markets'" (*sic erat scriptum*; italics added). *Id*. ¶ 42. For

example, a "Lands End" catalog can be printed on an iGen3. *See id.* ¶ 43. The iGen3 is an

"imaging system" that provides "new services," including "high quality color at a cost that makes

---

[9] According to the "Specifications" section of a document entitled "Press Forward", *see* Ex.
A to Pl's Br. (iGen3 Brochure), the iGen3 has the following "Technology Features":

    **SmartPress Imaging**
    Third generation technology; single-point transfer printing; closed-
    loop controls; benchmark gamut of CMYK dry inks; replace dry inks
    while running.
    **SmartPress Paper Handling**
    Mixed stocks in a single run; dual-edge registration; straight paper
    path; wide-radius inverter for second-side imaging; collated sets;
    wheeled stacker cart.
    **SmartPress Sentry**
    Built-in intelligence; automatically adjust to paper characteristics;
    monitors every print; provides on-line diagnostics and remote
    support.
JSMF ¶ 40.

sense even for short runs, print jobs -- from books to brochures and from statements to sell sheets". *Id*. ¶ 44. The iGen3 offers "versatile, high quality print" that rivals offset printing. *Id*. ¶ 45. The iGen3 reduces operating costs by, among other things, eliminating warehousing costs and inventory disposal rates. *Id*. ¶ 46. The benefits of the iGen3 are that it produces "offset-like quality on a digital platform," variable and customized content, and "commercial level quality" impressions. *Id*. ¶ 47. The iGen3 increases the "return on investment" by increasing the effectiveness and response to printed communications. *Id*. ¶ 48. The iGen3's "Key Applications" include short run, on demand "printing of brochures, books, flyers, postcards, newsletters, catalogues, manuals, Point of Purchase materials, sell sheets and more!" *Id*. ¶ 50. And, the iGen3's output has the "look and feel of offset printing." *Id*. ¶ 51. Customers that purchase the iGen3 must attend a mandatory three-week training program. *Id*. ¶ 49.

Subsequent to the parties' submission of their JSMF, the plaintiff also submitted averments claimed as material, but which the defendant disputes. Specifically, the plaintiff further averred that the iGen3 only handles digital files that are created on computers or units of computer systems, which the defendant denied on the ground that the terms "handles" and "units of a computer system" are vague. The defendant, in turn, averred that the iGen3 has the ability to produce impressions from digital files that are created on a personal computer or work station and transmitted to the DFE in the proper format and also that the iGen3 also has the ability to produce impressions from digital files that are created by a digital scanner and transmitted to the DFE in the proper format. *Cf.* Pl's Supplemental Statement of Material Facts Not in Dispute ("Pl's Supp. MF") ¶ 52, *with* Def's Response thereto (" Def's Supp. MF Resp.") ¶ 52 (citations omitted).

The plaintiff also averred that the iGen3 is solely used with an automatic data processing machine, and is connected to the central processing unit through a network, including the DFE server, and that the iGen3 can exchange data with the central processing unit, which the defendant denied on the ground that this purported fact is unintelligible and that the cited testimony is unclear as to whether the iGen3 is connected to the central processing unit ("CPU") of the DFE or some other computer or workstation.  Specifically, the defendant pointed out that in his deposition Mr. Maszerowski testified that a CPU is a "freely programmable computer", and the defendant claimed Mr. Maszerowski is incorrect, as a CPU is a "[t]he part of a computer in which operations are controlled and executed."  *Cf.* Pl's Supp. MF ¶ 53, *with* Def's Supp. MF Resp. ¶ 53 n.1, citing Ex. I of Pl's Supp. MF ¶ 53 and the *Oxford Dictionaries*' online definition of "central processing unit".  The defendant also averred that the cited testimony indicates that "information" comes "back" from the server and that scanned images can be received from the server but does not indicate that the information or scanned images are sent from the iGen3 to the server.  *Id*.  The defendant further averred that the iGen3 is connected to and works in conjunction with the DFE.  *Id*.

Lastly, the plaintiff also averred that the iGen3 connects to standard automatic data processing machines and networks using Ethernet, TC/PIP, Apple Talk, and prints files from any type of computer that is capable of connecting to a network, which the defendant denied on the ground that the phrase "standard automatic data processing machine" is vague.  The defendant averred in response that the iGen3 cannot print "files from any type of computer that's capable of connecting to a network"; that the iGen3 connects directly to the DFE; that the iGen3 can only process files that have been converted into a bitmap by the DFE; and that each DFE supports a set

of specific file formats.[10]  Pl's Supp. MF ¶ 54; Def's Supp. MF Resp. ¶54, referencing Ex. I of Pl's

Supp. MF.

             While helpful to a fuller understanding of the issues, the disputed averments are

immaterial to resolution of this case, given sufficient overlap of agreement on the "nature" of the

iGen3 Digital Production Press into which the imported merchandise would be incorporated, which

has reduced argument over the meaning of the competing tariff provisions to the point where

summary judgment is appropriate as contemplated in USCIT Rule 56 and by *Celotex Corp. v.

Catrett*, 477 U.S. 317 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  *See, e.g.*,

*Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) ("[w]hen the nature of the

merchandise is undisputed . . . the classification issue collapses entirely into a question of law");

*Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365-66 (Fed. Cir. 1998) and cases cited.

### III.  *Relevant Statutory Provisions*

             The following provisions of the HTSUS, year 2004 version, are relevant to this

dispute, in particular the classification of the iGen 3:

---

    [10]  Specifically: that the Xerox FreeFlow Print Server supports Adobe® PostScript® Level 1, 2, 3; Adobe® Acrobat® 7.0, PDF 1.6, PDF/X; TIFF, PCL5c, and PCL6XL; that the Xerox FreeFlow Print Server can also use data streams from AFP/IPDS, LCDS, or a VIPP or VI workflows; that the Creo Spire Color Server supports Postscript level 1, 2, 3, PDF/Acrobat, EPS, EPSF, DCS, DCSF, Print-ready RTP jobs, Creo VPS, and Xerox VIPP; that the EFI Fiery Color Server supports Postscript level 1, 2, 3, PDF 1.5/Acrobat 6, PDF/X-1a and 3, EPS, DCS 2.0, TIFF and TIFF/IT, and JPEG.  Pl's Supp. MF ¶ 54; Def's Supp. MF Resp. ¶54, referencing Ex. I of Pl's Supp. MF.  The defendant additionally averred that each DFE can only receive files from "client environments" (originating computers or workstations) that run specific operating systems; that the Xerox FreeFlow Server and Creo Spire Color Server can only receive files running from originating computers or workstations that run Windows 98/ME/NT 4.0/2000/XP, Macintosh OS 8.0 and higher, and OS X native; and that the EFI Fiery Color Server can only receive files from originating computers or workstations that run Windows 98/MT/XP/NT 4.x/2000, Macintosh OS 9.6 or higher, OSX v10.2.4, and UNIX with TCP/IP.  Def's Supp. MF Resp. ¶54.

### CHAPTER 84 -- NUCLEAR REACTORS, BOILERS, MACHINERY AND MECHANICAL APPLIANCES; PARTS THEREOF

Notes

5.  (A) For purposes of heading 8471, the expression "automatic data processing machines" means:

    (a) Digital machines, capable of (1) storing the processing program or programs and at least the data immediately necessary for execution of the program; (2) being freely programmed in accordance with the requirements of the user; (3) performing arithmetical computations specified by the user; and, (4) executing, without human intervention, a processing program which requires them to modify their execution, by logical decision during the processing run;

    *   *   *

    (B) Automatic data processing machines may be in the form of systems consisting of a variable number of separate units. Subject to paragraph (E) below, a unit is to be regarded as being a part of a complete system if it meets all the following conditions:
        (a) It is of a kind solely or principally used in an automatic data processing system;
        (b) It is connectable to the central processing unit either directly or through one or more other units; and
        (c) It is able to accept or deliver data in a form (codes or signals) which can be used by the system;

    *   *   *

    (D) Printers, keyboards, X-Y coordinate input devices and disk storage units which satisfy the conditions of paragraphs (B)(b) and (B)(c) above, are in all cases to be classified as units of heading 8471.

    (E) Machines performing a specific function other than data processing and incorporating or working in conjunction with an automatic data processing machine are to be classified in the headings appropriate to their respective functions or, failing that, in residual headings.

    *   *   *

Heading/Subheading

8443    Printing machinery used for printing by means of printing type, blocks,

plates, cylinders and other printing components of heading 8442;[11] ink-jet printing machines, other than those of heading 8471; machines for uses ancillary to printing; parts thereof:

|  |  |  |
|---|---|---|
|  | Offset printing machinery: |  |
| 8443.11 | Reel-fed: |  |
| 8443.11.10 00 | Double-width newspaper printing presses . . . . . . | 3.3% |
| 8443.11.50 00 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |
| 8443.12.00 00 | Sheet-fed, office type (sheet size not exceeding |  |
|  | 22 x 36 cm) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |
| 8443.19 | Other: |  |
| 8443.19.10 00 | Weighing 900 kg or less . . . . . . . . . . . . . . . . . . . . . | Free |
| 8443.19.50 00 | Weighing more than 900 kg but less than |  |
|  | 1,600 kg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |
|  | Weighing 1,600 kg or more . . . . . . . . . . . . . . . . | Free |
|  |  |  |
| 8443.19.90 00 | Letterpress printing machinery, excluding flexographic printing: |  |
| 8443.21.00 00 | Reel-fed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.2% |
| 8443.29.00 00 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |
| 8443.30.00 00 | Flexographic printing machinery . . . . . . . . . . . . . . . . . . . . | 2.2% |
| 8443.40.00 00 | Gravure printing machinery . . . . . . . . . . . . . . . . . . . . . . . | 2.2% |
|  |  |  |
|  | Other printing machinery: |  |
| 8443.51 | Ink-jet printing machinery: |  |
| 8443.51.10 00 | Textile printing machinery . . . . . . . . . . . . . . . . . | 2.6% |
| 8443.51.50 00 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |
| 8443.59 | Other: |  |
| 8443.59.10 00 | Textile printing machinery . . . . . . . . . . . . . . . . . | 2.6% |
| 8443.59.90 00 | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Free |

\*   \*   \*

8471    Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included:

\*   \*   \*

---

[11] Heading 8442 covers "Machinery, apparatus and equipment (other than the machine tools of headings 8456 to 8465), for type-founding or typesetting, for preparing or making printing blocks, plates, cylinders or other printing components; printing type, blocks, plates, cylinders and other printing components; blocks, plates, cylinders and lithographic stones, prepared for printing purposes (for example, planed, grained or polished); parts thereof".

8471.60          Input or output units, whether or not containing
                 storage units in the same housing:
                        Other:
                                        *   *   *
                        Printer units:
                                Assembled units incorporating at least the
                                media transport, control and print mechanisms:

8471.60.51 00                   Laser:
                                        Capable of producing more than
                                        20 pages per minute . . . . . . . . . . . . . . . . .         Free
8471.60.52 00                           Other . . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.53 00                   Light bar electronic type . . . . . . . . . . . . . . . .         Free
8471.60.54 00                   Ink jet . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.55 00                   Thermal transfer . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.56 00                   Ionographic . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.57                      Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
                        30      Daisy wheel . . . . . . . . . . . . . . . . . . . . . . . .
                        60      Dot matrix . . . . . . . . . . . . . . . . . . . . . . . . .
                        90      Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . .


                        Other:
8471.60.61 00                   Laser:
                                        Capable of producing more than
                                        20 pages per minute . . . . . . . . . . . . . . . . .         Free
8471.60.62 00                           Other . . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.63 00                   Light bar electronic type . . . . . . . . . . . . . . . .         Free
8471.60.64 00                   Ink jet . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.65 00                   Thermal transfer . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.66 00                   Ionographic . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
8471.60.67                      Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         Free
                        30          Daisy wheel . . . . . . . . . . . . . . . . . . . . . .
                        60          Dot matrix . . . . . . . . . . . . . . . . . . . . . . .
                        90          Other . . . . . . . . . . . . . . . . . . . . . . . . . . .

                                        *   *   *

8472      Other office machines (for example, hectograph or stencil duplicating
          machines, addressing machines, automatic banknote dispensers, coin-sorting
          machines, coin-counting or wrapping machines, pencil-sharpening machines,
          perforating or stapling machines):

8472.10.00 00          Duplicating machines . . . . . . . . . . . . . . . . . . . . . . . . . . . .         1.6%

| | | | |
|---|---|---|---|
| 8472.20.00 00 | | Addressing machines and address plate embossing machines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.1% |
| 8472.30.00 00 | | Machines for sorting or folding mail or for inserting mail in envelopes or bands, machines for opening, closing or sealing mail and machines for affixing or canceling postage stamps . . . . . . . . . . . . . . . . | 1.8% |
| 8472.90 | | Other: | |
| 8472.90.10 00 | | Automatic teller machines . . . . . . . . . . . . . . . . . . | Free |
| 8472.90.40 00 | | Pencil sharpeners . . . . . . . . . . . . . . . . . . . . . . . . . | 2.6% |
| 8472.90.60 00 | | Numbering, dating and check-writing machines . . | Free |
| 8472.90.70 00 | | Accessory and auxiliary machines which are intended for attachment to an electrostatic photocopier and which do not operate independently of such photocopier . . . . . . . . . . . | Free |
| 8472.90.80 00 | | Printing machines other than those of heading 8443 or 8471 . . . . . . . . . . . . . . . . . . . . . | Free |
| 8472.90.90 | | Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.8% |
| | 40 | Desktop note counters and note scanners  . . . . | |
| | 60 | Other currency and coin handling machines . . . | |
| | 80 | Other  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

## IV. *Analysis*

The central issue here is whether the iGen3 is itself classifiable as a unit of an ADP system, as contended by the plaintiff, or whether it is excluded from that designation on the ground that, working in conjunction with an automatic data processing machine, the iGen3 is a machine performing a "specific function *other than* data processing" within the meaning of Note 5(E) of Note 5 to chapter 84 (italics added) as contended by the defendant.

The defendant's position here, that the iGen 3 is not a "unit" of an ADP machine of heading 8471, is consistent with its prior administrative rulings on the classification of the iGen3 itself and similar merchandise.  In Headquarters ("HQ") Ruling 967514 (June 6, 2005), which reconsidered New York ("NY") Ruling I81178 (May 20, 2002), Customs classified the iGen3 in

subheading 8472.90.80.  *See also* HQ 965051 (May 1, 2002), discussed *infra*.  In HQ 967514,

Customs concluded that because the iGen3 "has the characteristics of a digital production press for

the printing industry" and performs "short run, on demand" printing,[12] Note 5(E) of chapter 84

applies because short run, on demand is not a data processing function based on the analyses of

previous ruling letters.  Customs thus considered the iGen3 "precluded" from classification in

heading 8471 and correctly classifiable in heading 8472.90.80, with the power supply unit in

subheading 8504.90.95.  *See* HQ 967514.

          Following that ruling, upon actual importation of the power supply units at bar,

Customs adhered to HQ 967514 and classified them as "other" static converters under subheading

8504.40.95.  The plaintiff filed its protest thereof on May 5, 2005, which Customs denied on the

authority of HQ 967514 and NY I81178, *i.e.*, that the iGen3 is classifiable as an "other" office

machine under heading 8472, and thus the power supply "to be incorporated into this unit" was not

classified as part of unit of an automatic data processing ("ADP") machine.

          The genesis of HQ 967514 appears to have been HQ 959651 (July 9, 1997),[13] in

which Customs considered whether the "AGFA Chromapress digital color printing system" is

classifiable as an ADP machine or as printing machinery.  The applicant argued that the

Chromapress is an ADP printer in accordance with Notes 5(B) and 5(D) to chapter 84.  Customs,

---

[12]  Customs defined short run, on demand printing therein as "the ability to economically print 1000 or less documents, for a customer order, with the unique capabilities of a digital press, including speed, volume output, use of a wide variety of stocks, and mixed stocks in a single run, and automatic collation."  HQ 967514.

[13]  *See also* HQ 957981 (July 9, 1997) (classification of "Xeikon DCP-1 digital color printer").

however, concluded that it "is more than just an ADP printer, it is an entire printing system [that]

acts as a functional unit designed to replace off-set printing presses", and that Note 5(E) to chapter

84 clearly states that machines performing a specific function are to be classified in the heading

appropriate to their respective functions, which is a "separate prerequisite" that must be met in order

to classify a machine as a unit of an ADP machine.  *See* HQ 959651 at 3, quoting HQ 957491 (July

31, 1996).

      In that decision, Customs reinforced its conclusion by reference to the ENs to chapter

84.[14]  *Id*. at 3-4.  After reviewing sales literature for the Chromapress that claimed efficiencies in

"short-run color printing" as well as the 1993 New York Times article "Gutenberg Goes Digital" and

a 1995 "Print on Demand Business" article, Customs concluded that the Chromapress is a

---

[14]  At the time (and unchanged to the present), EN 84.71 provided, in relevant part, on the interpretation of "machines incorporating or working in conjunction with an [ADP] machine and performing a specific function", as follows:

> In accordance with the provisions of the last paragraph of Note 5 to Chapter 84, the following classification principles should be applied . . . :
>
> > (i) A machine incorporating an automatic data processing machine and performing a specific function *other than* data processing is classifiable in the heading corresponding to the function of that machine or, in the absence of a specific heading, in a residual heading, and not in heading 84.71.
> >
> > (ii) Machines presented with an automatic data processing machine and intended to work in conjunction therewith to perform a specific function *other than* data processing, are to be classified as follows: the automatic data processing machine must be classified separately in heading 84.71 and the other machines in the heading corresponding to the function which they perform unless, by application of Note 4 to Section XVI or Note 3 to Chapter 90, the whole is classified in another heading of Chapter 84, Chapter 85 or of Chapter 90.

HCDCS, EN 84.71(E) (italics added).

"functional" unit by reason of Note 4 to Section XVI[15] and Note 5(E) to chapter 84 and is therefore

classifiable, according to its function, in heading 8443 as "printing" machinery.  *Id*. at 4-5.  Customs

dismissed the argument that EN 84.43 for heading 8443 limits printing machinery to those types of

machines that print by means of type, printing blocks, plates, or cylinders of heading 8442, on the

ground that nothing in the legal text of heading 8443 provides for no such limitations, and "[i]t must

also be remembered that the tariff statutes were enacted 'not only for the present but also for the

future, thereby embracing articles produced by technologies which may not have been employed or

known to commerce at the time of the enactment.'"  *Id*. at 6, quoting *NEC America, Inc. v. United*

*States*, 8 CIT 184, 186, 596 F. Supp. 466, 468 (1984), *quoting Corporacion Sublistatica, S.A. v.*

*United States*, 1 CIT 120, 126, 511 F. Supp. 805, 809 (1981).

Subsequently, in HQ 965051 (May 1, 2002), Customs addressed the classification of

the "Heidelberg Digimaster 9110", a high speed, high volume printer, or "digital imaging system,"

with an output rate of 110 pages per minute and designed for the 300,000 to 800,000 copies per

month market.[16]  Relying on HQ 959651 and HQ 957981, *supra*, Customs similarly held that the fact

that the Digimaster 9110 "is used primarily as a short-run digital printer rather than as a standard

digital copy machine . . . [is] a function other than data processing, and the Digimaster 9110 is thus

---

[15] Note 4 to Section XVI provides: "Where a machine (including a combination of machines) consists of individual components (whether separate or interconnected by piping, by transmission devices, by electric cables or by other devices) intended to contribute together to a clearly defined function covered by one of the headings in chapter 84 or chapter 85, then the whole falls to be classified in the heading appropriate to that function."  Note 4 to Section XVI.

[16] The Digimaster 9110 allows the printing of documents from stored files, scanned documents (after installation of the optional scanner) and/or data print streams, and is designed for short run, on demand printing as well as desktop publishing and printing manuals, booklets and graphics.  HQ 965051 at 1.

precluded from classification under heading 8471".   HQ 96501 at 2.   In so ruling, Customs

distinguished various New York ruling letters to which the Digimaster 9110 applicant pointed, which

had classified "a variety of multi-function fax/copier/printers as units of ADP machines", on the

ground that they were dependant upon Customs' application of GRI 3(b) to determine the essential

character of machines that could send and receive facsimiles, digitally reproduce documents scanned

into memory, and print ADP output:

> These machines, however, are distinguishable from the Digimaster 9110, in that they
> functioned as stand-alone copiers *with the additional abilities* to fax and function as
> ADP printers, while the Digimaster 9110 is imported without the digital scanner . . . .

*Id*. (italics added).

There are several observations to be made at this point.   First, in *Digidesign, Inc. v.

United States*, 39 CIT ___, 44 F. Supp. 3d 1366 (2015), Customs defended its classification of

imported "control surfaces" consisting of switches, faders, and knobs on consoles that allowed a user

to edit, mix, and manipulate music in digital file format fed to music editing software on a connected

computer.   The court accepted Customs' argument that Note 5(E) excluded the merchandise from

classification as ADP units on the basis of the "working in conjunction with" language of Note 5(E),

due to the fact that the control surfaces were capable of stand-alone functionality in analog

modalities that did not involve data processing.[17]   Notable here is that Customs' position in

---

[17]   *Digidesign* relied on *BenQ* to interpret Note 5(E).   *See BenQ America Corp. v. United
States*, 646 F.3d 1371 (Fed. Cir. 2011).   *BenQ* concerned the classification of monitors equipped
with connectors for receiving data from a personal computer, digital camera, VCR, DVD player and
other devices.   Although the Federal Circuit did not interpret Note 5(E) in a *stare decisis* sense, it
observed that Note 5(E) "is limited to" machines performing a specific function other than data
processing and incorporating or working in conjunction with an automatic data processing machine,
and deduced that "when 'performing a specific function other than data processing,' such as when

(continued...)

*Digidesign* stands in contrast to its rationale in HQ 96501, as indicated by the quoted passage above.

Second, it is of some significance to the matter at bar that in contrast to HQ 959651, *supra*, but similar to the recent classification of the iGen3 in HQ 967514, Customs in HQ 965051 found the Digimaster properly classifiable as an "office machine not more specially provided for" under subheading 8472.90.80 (*i.e.*, "printing machines other than those of heading 8443 or 8471"). The reason provided for not classifying the merchandise, consistent with HQ 959651, in heading 8443 -- which, as mentioned, specifically covers "printing machinery" -- was that, effective January 1, 2002, the article description of heading 8443 was modified and, according to Customs at the time, that heading "is now reserved for printing machines that operate by means of printing type blocks, plates, cylinders and other printing components of heading 8442, HTSUS, or ink-jet printing machines, other than those of heading 8471". HQ 965051 at 3. Nonetheless, it is fairly clear from that ruling, although it is unstated, that Customs continued -- and continues -- to regard printers such as the Digimaster to be the functional equivalent of a large-scale commercial printing industry printer, such as an offset printing press, but due to the statutory change in the language of heading 8443 and its interpretation thereof, Customs settled for classification in heading 8472 ("other office machines", specifically subheading 8472.90.80, which covers "Other: . . . Printing machines other than those of heading 8443 or 8471").

---

[17] (...continued)
the monitors are serving as video monitors for other devices such as DVD players and VCRs, the monitors are 'working in conjunction' with those other devices, not with an automatic data processing machine." 646 F.3d at 1379 (footnote omitted).

Third, the year 2002 version (3d ed.) of EN 84.72 further describes each of these[18]

types of office machines, but it provides no further indication of what a printing machine "other than

those of heading 8443 or 8471" would constitute in the "other office machine" context -- only that

the term "office machines" is to be taken in a wide general sense to include all machines used in

offices, shops, factories, workshops, schools, railway stations, hotels, *etc*., for doing "*office work*"

(*i.e.*, work concerning the writing, recording, sorting, filing, *etc*., of correspondence, documents,

forms, records, accounts, *etc*.) -- and this explanation has essentially been repeated up through the

current (2012; 5th ed.) version of EN 84.72.

C

The parties have agreed that the iGen3 satisfies the requirements of Note 5(B)(b) and

5(B)(c), in that the iGen3 is connected by cables directly to a dedicated DFE print controller, which

is connected to computer or workstation, and can only perform print operations upon receipt of

digital files or commands.  The plaintiff also contends, and the defendant does not appear to dispute,

that Note 5(D) excuses printers, *inter alia*, from satisfying the conditions of Note 5(B)(a).  The

plaintiff thus contends Note 5(E) is inapplicable because the iGen3 only performs the data processing

---

[18] As indicated above, heading 8472 covers "Other office machines (for example, hectograph
or stencil duplicating machines, addressing machines, automatic banknote dispensers, coin-sorting
machines, coin-counting or wrapping machines, pencil-sharpening machines, perforating or stapling
machines)", and the specific subheadings of "printing machinery" of heading 8472 in addition to
printing machines other than those of 8471 are for duplicating machines, addressing machines and
address plate embossing machines, machines for sorting or folding mail or for inserting mail in
enveloped or bands, machines for opening, closing or sealing mail, and machines for affixing or
cancelling postage stamps, automatic teller machines, pencil sharpeners, numbering, dating and
check writing machines, accessory and auxiliary machines which are intended for attachment to an
electrostatic photocopier and which do not operate independently of such photocopier, desktop note
counters and note scanners, and other currency and coin handling machines, and "other" office
machines.

function of "digital printing" and "would not function without the transmission of data from the ADP machine or system".  Pl's Br. at 24.  It argues that there is no "line" "beyond which a printing apparatus becomes so big and technologically advanced that it is no longer a printer, [n]or so small and mechanically simple that it is no longer a press."  Pl's Br. at 22.

To the extent the plaintiff argues that "every printing apparatus that prints data transmitted from an ADP is a unit of an ADP machine of heading 8471", the defendant responds that "simply cannot be the case" because printers of Note 5(D) are subject to Note 5(E) by virtue of Note 5(B), and because headings 8443, 8472, and 8479 can all cover, among other things, printing apparatus that connect to ADP machines and print the output of ADP machines.  Def's Resp. and Cross Mot. at 14-15, referencing subheadings 8443.51.10, 8443.51.50), 8472.90.80, and 8479.89.96. Emphasizing the plaintiff's marketing of the iGen3 as a "digital production press,"[19] the defendant's

---

[19]  *I.e.*, as an "imaging system" that provides "new services," including "high quality color at a cost that makes sense even for short runs, print jobs-- from books to brochures and from statements to sell sheets."  Ex. A to Pl's Br., "Press Forward" (iGen3 Brochure) at 2. The marketing materials also emphasize the iGen3's ability to quickly and economically produce complex materials in varying quantities (*i.e.*, the iGen3 is "the first digital production press that's totally at home in an inplant print shop or a commercial print environment", offering "the flexibility, quick turn-around times, and economics that characterize digital printing while producing output with the look and feel of offset printing"; with the ability "to print exact quantities instead of thousands extra in an effort to bring down the per unit cost as in the offset world" the iGen3 "is the complement to your offset environment[,] . . . providing offset quality and a digital workflow, offering the best of both worlds", and "eliminat[ing] the manual preparation for offset, which makes color economical only as the quantities reach very high levels").  *See id.* at 4, 8.  The defendant also emphasizes the marketing of the iGen3's ability to produce high quality color materials ("iGen3's SmartPress Technology™ adjusts ink and imaging for each sheet that passes through the Press . . . . The Press runs a wide array of stocks. . . .  The Press measures the color between every single impression, for consistency from sheet to sheet and shift to shift").  *See id*. at 3.  Summarizing, the defendant argues that "the theme that runs through [plaintiff]'s marketing materials is that the iGen3 is a 'digital press' that has the technical capabilities to produce materials that have the appearance of materials printed on an offset printing press and that the iGen3's primary purpose is to increase a company's business by offering

(continued...)

essential contention is that the iGen3 performs a "specific function" other than ADP in the form of

short run, on demand printing, that "printing is not inherently a data processing function," and that

while printing may use a new method, *e.g.*, digital technology, "the end result is still printing, *i.e.*,

the reproduction of text and illustrations onto paper." Def's Resp. and Cross Mot. at 14 n.9; *see also*

Def's Reply at 8-9.

          To the extent that is true, it lays bare the inherent contradiction between Note 5(D)

and Note 5(E) to chapter 84. Whether referring to the encasement of a printer or the specific "case"

of a classification situation,[20] the meaning of "in all cases" in Note 5(D) would seem to be clear.

And yet, Note 5(D) is still "subject to" the "specific function" exclusion of Note 5(E). Thus, is there

an identifiable point in the HTSUS at which a digital printer becomes a printer that performs a

specific function "other than" data processing? If so, it is certainly vague, because the function of

all digital printers, apparently,[21] is to print digital output and/or process digital data to some degree.

Therefore, in order to resolve the contentions here, the meaning of a "specific function" of Note 5(E)

must at a minimum be interpreted in the sense of "as distinct from" data processing.

---

          [19] (...continued)
new services and by increasing the effectiveness of its marketing opportunities." Def's Resp. and
Cross Mot. at 17, referencing Ex. B to Pl's Br. (FreeFlow® Print Server Specifications).

          [20] *But cf.* subheading 8471.60 (describing "[i]nput or output units, whether or not containing
storage units in the same *housing*") (italics added).

          [21] *Cf.* Pl's Reply at 3 n.2 ("[a] smaller printer will also contain a DFE controller to handle
communications with the computer network, but this will be a small, board-level unit contained in
the printer housing itself") *with* Transcript of Oral Argument at 17:10-17:24 ("[T]he digital front end
. . . is sort of an adapted computer, and the mainframe will send data to the adapted computer . . . A
digital stream will come to the front end, to the printer, and . . . [i]t will convert it, it will adjust it,
or it will route it to the proper software, it will use the software, and it will print your product[.]"),
34:15 ("all printers have a digital front end, even little, tiny black-and-white printers").

The Explanatory Notes define "data processing" as that which "consists in handling information of all kinds, in pre-established logical sequences and for a specific purpose or purposes." EN 84.71(I), at 1575; *Optrex Am., Inc. v. United States*, 30 CIT 192, 214 (2006). Of note here is the fact that the HTSUS drafters did not consider printing *per se* to be a Note 5(E) exception to Note 5(D), insofar as they provided for various "printer units" of ADP machines that are clearly and specifically provided for in heading 8471. *Cf.* Note 5(D) to ch. 84 *with* subheading Note 1 to ch. 84 ("[f]or the purposes of subheading 8471.49, the term 'systems' means automatic data processing machines whose units satisfy the conditions laid down in note 5(B) to chapter 84 and which comprise at least a central processing unit, one input unit (for example, a keyboard or a scanner), and one *output unit* (for example, a visual display unit or a *printer*") (italics added) & subheadings 8471.60.51.00 through 8471.60.67.90 (input or output units, whether or not containing storage units in the same housing: laser, light bar electronic type, ink-jet, thermal transfer, ionographic, daisy wheel, dot matrix, and other). In other words, given the organization of the year 2004 HTSUS, the inescapable conclusion is that the drafters by or at that time must have concluded that the meaningful output of data, in a useful or useable form, is a necessary part of the complete ADP process, *i.e.*, not only the process of rasterizing a digital file but also the printing of the rasterized image onto a substrate with a substance such as an ink or dye, because machines that print digital output have been (at least at that time) themselves considered "output units" of ADP machines.[22]

---

[22] It further goes without saying that the output of an ADP machine must be rendered in a useful form, whether in a more permanent form or not, in order to be meaningful. "Digital printing" is thus a function of data processing, as contended by the plaintiff. And all ADP printing, whether short or long run, is "on demand" and digital, regardless of whether the imaging technology is laser, thermal, dot matrix, *et cetera*. Were the defendant's contention taken to its logical conclusion, of
(continued...)

The defendant's essential contention is that iGen3 printing is not "mere" printing but high-end, "special function" printing such as that encompassed by the ink-jet printers discussed in the 2002 version of EN 84.71 that was in existence at the time of importation:

> In accordance with Note 5(D) to this Chapter, printers, keyboards, X-Y coordinate input devices and disc storage units which satisfy the conditions of items (b) and (c) above, are in all cases to be classified as constituent units of data processing systems.
>
> The foregoing provision is, however to be considered in the overall context of Note 5 to Chapter 84 and is therefore applicable subject to the provisions of paragraph (E) of that Note, by virtue of the introductory part of paragraph (B) thereof. Thus, ink-jet printers working in conjunction with an automatic data processing machine but having, particularly in terms of their size, technical capabilities and particular applications, the characteristics of a printing machine designed to perform a specific function in the printing or graphic industry (production of pre-press colour proofs, for example) are to be regarded as machines having a specific function classifiable in heading 84.43.

Def's Resp. and Cross-Motion Br. at 12 & Def's Reply at 4, quoting Def's Cross-Motion Br. Addendum, EN 84.71 at 1577.[23]   The defendant argues that the above example demonstrates that

---

[22]   (...continued)

"printing" as not inherently being a data processing function, then the drafters would have concluded that no digital printing is classifiable under heading 8471, which is clearly not the case.

[23]   Which version of the Explanatory Notes the defendant provides in its Addendum is unclear, as the 2002 version is not so paginated. Although the 2002 version retains that language, but without the defendant's copy's pagination, the second paragraph of the above quoted passage was eliminated from EN 84.71 in the 2007 version, from which point (to the present) the Explanatory Notes have provided only an essential restatement of Note 5(E):

> If the unit performs a specific function other than data processing, it is to be classified in the heading appropriate to that function or, failing that, in a residual heading (see Note 5(E) to this Chapter). If an apparatus . . . is not performing a data processing function, it is to be classified according to its characteristics by application of General Interpretive Rule 1, if necessary in combination with General Interpretive Rule 3 (a).

*E.g.*, EN to 84.71 (2012) at XVI-8471-4. Although the law in effect at the time of Customs' decision on the protest applies on review thereof, *see*, *e.g.*, *Morris Costumes, Inc. v. United States*, 30 CIT

(continued...)

there is, in fact, a "line" distinguishing a  printing apparatus as not classifiable in heading 8471 depending upon a machine's characteristics in terms of size, technical capabilities, and applications, and that the plaintiff's own marketing materials for the iGen3 show that it "has the characteristics (size, technical capabilities, and applications) of a printing machine designed to complement, or even rival, the functions of an offset printing press by performing the specific function of economical [short run, on demand] printing of complex materials in high quality color for the graphic arts and printing industries."  Def's Resp. and Cross-Motion Br. at 15.

The defendant's emphasis on the iGen3 as a "rival" of an offset printer of heading 8443 appears to contradict Customs' classification of the iGen3 as an "other office machine" of heading 8472, specifically an "other" printing machine "other than those of heading . . . 8471" of subheading 8472.90.80, but be that as it may, the plaintiff's reply is that ADP systems come in all sizes and complexities, of course, from non-networked desktop personal computers to large-scale mainframe or distributed capacity networks with hundreds or thousands of users in a single location, and they are not limited to a "mere" network or desktop printer by statute, *i.e.*, that nothing in the statute itself suggests that a printer of heading 8471 is constrained by its size or speed, and that the defendant identifies no "technical capabilities" of the iGen3 that would disqualify it from classification as an ADP printer or a unit of an ADP machine.  The plaintiff points out that whereas the iGen3 could print 500 insurance policies in a single print run, with different details and data in each, something no traditional offset printer can do, given sufficient data buffering (which might be

---

[23]  (...continued)
1898 (2006), neither Customs' rulings nor the ENs are binding to or dispositive of the decision to be made in the here and now.

provided by connection to a DFE) a common desktop printer could do the same thing, albeit much more slowly.  Pl's Reply at 13.

The court agrees with the plaintiff that the nature, exactly, of "short run, on demand" printing, which the defendant claims is a specific non-data processing function, is vague, and therefore problematic.  A common work group printer attached to an ADP network is capable of printing 1000 or fewer (or more) documents for a specific order and might have several paper trays, holding different print stocks that can be used in a single run, and such a printer is classifiable -- rightly, the plaintiff adds -- as an ADP output unit.  *E.g.*, NY J86411 (July 21, 2003).  In other words, short run, on demand printing is exactly what any ADP printer unit attached to an ADP system or network is capable of doing.

Is there a basis in the HTSUS for distinguishing the *quality* of the output of a digital printer in the manner apparently advocated by the defendant for purposes of classification (*e.g.*, "look and feel" of offset printing)?  Apparently not.  The court can agree with the defendant that printing, *qua* printing, is not inherently a data processing function, but it is not possible, in the context of this case, to distinguish the quality of digital print in its own right among the provisions of the HTSUS that control the outcome here, *i.e.*, as a "special function" of Note 5(E), due to the manner in which printers in the subheadings of heading 8471, 8443, and 8472 are specified and arranged in the year 2004 version of the HTSUS.  All the relevant provisions appear to implicate only the machines' operations, not the quality of what they can produce.

Certainly heading 8443 covers "printing machinery used for printing," and one might surmise that offset printers can provide excellent quality, but that part of the heading is only qualified

"by means of printing type, blocks, plates, cylinders and other printing components of heading 8442" as noted by Customs in HQ 965051.  While heading 8443 also[24] specifically covers "ink-jet printing machines other than those of heading 8471" (clearly indicating that not all ink jet printers are classifiable in heading 8443), the iGen3 (a) is not an ink-jet printer, (b) it is not the functional equivalent of an ink-jet printer, and, more importantly, (c) it is not a "specific function" printer, as it is multi-functional.  *See* JSMF ¶ 30.

The meaning of a "specific function" machine of Note 5(E) appears to have been intended in the sense of a "dedicated" function, as indicated by the type of ink-jet printer (to which the defendant points) dedicated to "production of pre-press colour proofs" mentioned in EN 84.71 (2002 or earlier).[25]  The "specific function" distinction is, in any event, vague in the context of this case, as ink-jet printers are, generally speaking, rather known for their multi-functionality, especially insofar as their unique technology allows printing of a wide variety of substances, such as edible inks or even organic tissue, onto a wide variety and size of substrates or surfaces, such as rice paper,

---

[24] Not pertinent here, heading 8443 lastly covers "machines for uses ancillary to printing, and parts thereof".

[25] An example thereof might be the IRIS series of ink-jet printers, first introduced in the mid-1980s as a continuous flow ink system specifically designed for interface with digital pre-press systems.  *See, e.g., Andren & Associates v. Scitex American Corp.*, No. 95-C-276, 1996 U.S. Dist. LEXIS 16954, (N.D. Ill. Nov.8, 1996) (contract dispute over Iris model 4012).  *Cf.* Uwe Stainmueller and Jürgen Gulbins, *The Art of Digital Fine Art Printing* (Mar. 2006 ed.), pp. 1-21 ("[t]he IRIS printer, at an early stage of inkjet history, provided a reasonably high print speed and considerable resolution and image quality, while print permanence and maintenance were problems") *with Avecia, Inc. v. United States*, 30 CIT 1956, 1359-62 (describing evolution of color ink-jet inks in addressing such problems).

glass, wood, fabric, or even automobiles.[26]  *Cf.*, *e.g.*, *Kopykake Enterprises, Inc. v. the Lucks Company*, 264 F.3d 1377 (Fed. Cir. 2001); *Mead Digital Systems Inc. v. A.B. Dick Co.*, 723 F.2d 455, 456 (6th Cir. 1983) ("ink jet printing[ ] is now used by businesses which require high speed printing or printing on soft or other unusual surfaces" and "[i]nk jet printers are particularly well-suited for computer print-outs and labeling").  Implicitly, by contrast, the digital printers specified as covered by heading 8471 are not so limited or dedicated, and neither is the iGen3, the parties having agreed that it is multi-functional.

        The defendant, however, makes much of the fact that the plaintiff marketed the iGen3 as a complement to or even a rival of offset printing, or that some use the iGen3 to perform print jobs that in an earlier age might have been relegated to offset.  These points also do not dispose of the iGen3's classification, because the iGen3's functionality is far more flexible than that of a traditional offset printer.  Traditional printers cannot vary the content of the document or image, let alone perform short run, on demand printing, which, the parties apparently agree, is a function of a digital process.  Performing such a process does not remove the printer from the definition of an ADP unit; it simply indicates a situation where an operation, formerly performed by a non-ADP device, is now performed as an ADP function.[27]

---

        [26] A further distinction from ink-jet printers, or rather ink-jet printing technology, is that laser printers like the iGen3 appear limited at this point in time by size, type and thickness of substrate that can be accommodated, in contrast to ink-jet printing technology, and at least insofar as the papers here indicate.  *See*, *e.g.*, Pl's Br. at 2-3; JSMF ¶¶ 22-28.

        [27] In this regard, the plaintiff makes a compelling point:  "Under the [defendant's] logic, a computer keyboard or a printer might be classified as a 'typewriter' because they perform writing functions (keystrokes, placing marks on paper) formerly done by a typewriter.  Indeed, when pounding away on a keyboard, even in 2015, a typical computer user is likely to say that he or she
(continued...)

Unlike headings 8443 and 8472, heading 8471 encompasses a laser printer as a unit of an ADP machine of heading 8471, as indicated in the subheadings therefor, whereas neither heading 8443 nor heading 8472 nor the subheadings thereof specify laser printers, only "other" printers.  Unlike heading 8443, which has classification provisions for "other" offset printers based on weight, nothing in heading 8471 indicates that printers thereof must not exceed a certain size, nor is there any indication of "special" functionality that would exclude printers that meet the requirements of Note 5(B) from heading 8471.  And unlike headings 8443 and 8471, heading 8472 (in which Customs determined the iGen3 classifiable) and its subheadings, *see supra*, describe printers that are even further removed from descriptive coverage of the iGen3 for the reasons aforesaid.  Heading 8472 is intended to cover the kind of "office work" machinery explained by EN 84.72, and it is clear, in accordance with such explanation, that the iGen3 is not mere "office work" machinery and is unlike any of the printers described by heading 8472.  *Cf.* NY J86411, *supra*.

The iGen3, being a far more technologically sophisticated machine than an offset printer of heading 8443 or the kinds of "other office machine" printers specified by heading 8472, apparently does not "function" like an offset printer or the other office machine printers of heading 8472, and there is no requirement in heading 8471 that printers thereof cannot exceed a certain print quality.  Nor, for that matter, is there any indication of print quality in heading 8443 or subheadings thereof.  The only distinction among the subheadings of heading 8471 is with respect to the number

---

[27] (...continued)

is 'typing,' though there might be no typewriter in the vicinity. Similarly, computers today are used to perform a wide range of functions formerly performed by the 'word processors' of heading 8469, but they are not classified in that heading because heading 8471 and its associated chapter notes more fully and specifically describe them."  Pl's Reply at 14.

of pages per minute that are printable.  Subheading 8471.60.51.00 in particular covers an ADP

machine "output unit[ ]" in the form of a "laser" printer "[c]apable of producing more than 20 pages

per minute", which provision of the year 2004 version of heading 8471 provides the most accurate

HTSUS description of that aspect of the iGen3's functionality.

Lastly, the court notes in passing that the fact that language of subheading

8471.60.51.00, along with other printer subheadings of heading 8471, has since been moved to

within heading 8443 does not speak in favor of holding the iGen3 classifiable at the time of its

importation in 2004 under that heading (8443), but actually makes the conclusion that the iGen3 is

classifiable under the language of that subheading, as it existed at the time under heading 8471, more

compelling.

## V.  *Conclusion*

All in all, the evolution of Johannes Gutenberg's machine to unimpressive digital

print is rather impressive.  That the iGen3 can perform operations formerly or alternatively

performed by non-ADP machines does not mean that it is not an ADP unit, because, as Customs

earlier pointed out, the tariff nomenclature is designed to adapt to changing technologies.  *See* HQ

959651, *supra*, at 6 (citations omitted).  The meaning of automatic data processing machine "will

be held to embrace all articles subsequently created [that] come within its scope."  *Sears, Roebuck*

*& Co. v. United States*, 46 C.C.P.A. 79, 82 (1959).  Accordingly, judgment will be entered in the

plaintiff's favor.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated:  November 23, 2015
New York, New York